1  **THOMAS J. DALY**, CA Bar No. 119684
   thomas.daly@cph.com
2  **EDWARD R. SCHWARTZ**, CA Bar No. 147553
   ers@cph.com
3  **STEVEN E. LAURIDSEN**, CA Bar No. 246364
   steven.lauridsen@cph.com
4  **CHRISTIE, PARKER & HALE, LLP**
   655 North Central Avenue, Suite 2300
5  Post Office Box 29001
   Glendale, California 91209-9001
6  Telephone: (626) 795-9900
   Facsimile: (626) 577-8800
7
   Attorneys for Defendants,
8  Ample International, Inc.,
   Chen Chen a/k/a Jane Chen and Aprille Vergara
9

10                UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

| 13 | LUKASIAN HOUSE, LLC, | Case No. 2:11-cv-06449-JFW-FMO |
|----|----------------------|--------------------------------|
| 14 | Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 15 | vs. | |
| 16 | AMPLE INTERNATIONAL, INC., CHEN CHEN a/k/a JANE CHEN, APRILLE VERGARA, | |
| 17 | | **DATE:** April 23, 2012  **TIME:** 1:30 P.M.  **CTRM:** 16 |
| 18 | Defendants. | |
| 19 | | **Hon. John F. Walter** |
| 20 | | **Complaint Filed:** 08/05/2011  **Discovery Cutoff Date:** 04/01/2012  **Pretrial Conf.:** 06/08/2012  **Trial Date:** 06/26/2012 |
| 21 | | |
| 22 | | |

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ........................................................................... 1

II.  STATEMENT OF FACTS ............................................................ 2

III. LEGAL STANDARDS ................................................................. 4

IV.  LH DOES NOT POSSESS VALID TRADE SECRETS ................................ 5

    A.   LH Did Not Take Sufficient Steps To Protect Its Alleged Secrets .......................................................................... 5

        1.   LH's Supplier and Customer Information Is Publicly Available On The Internet ...................................... 7

        2.   LH Provided Financial And Customer Information To Vergara After She Was No Longer Employed By LH .............. 8

        3.   LH's "Trade Secrets" Were Not Subject To Any Of The Typical Controls Used To Protect Valid Trade Secrets............. 8

        4.   The "Trade Secrets" Were Publicly Disseminated ................ 11

        5.   The "Trade Secrets" Were Not Protected By Any Nondisclosure Agreements ...................................... 11

    B.   The Information Does Not Have Independent Economic Value ....... 12

V.   LH DOES NOT POSSESS A VIABLE CLAIM UNDER THE COMPUTER FRAUD AND ABUSE ACT – 18 U.S.C. § 1030(G) ............ 14

    A.   Defendants' Purported Unauthorized Access Does Not Create Liability As A Matter Of Law ............................................ 14

    B.   The Computer Fraud And Abuse Act Does Not Allow For The Type Of Recovery LH Seeks ............................................. 17

VI.  LH DOES NOT HAVE A VIABLE CLAIM FOR A VIOLATION OF THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT ................................................. 20

VII. DUTY OF LOYALTY ................................................................ 22

VIII. LH'S UNFAIR COMPETITION CLAIM FAILS BECAUSE ALL OF THE ALLEGED ACTIVITY IS LAWFUL ................................ 23

IX.  THE PROSPECTIVE INTERFERENCE WITH ECONOMIC ADVANTAGE CLAIM FAILS BECAUSE ALL OF THE ALLEGED ACTIVITY IS LEGAL ................................................. 25

X.   CONCLUSION......................................................................... 25

CHRISTIE, PARKER & HALE, LLP

# **TABLE OF AUTHORITIES**

Page(s)

<u>CASES</u>

*Aagard v. Palomar Builders, Inc.,*
  344 F. Supp. 2d 1211 (E.D. Cal. 2004)............................................25

*Allied N. Am. Ins. Broker. Corp. v. Woodruff-Sawyer,*
  No. C 04-2527 MJJ, 2005 U.S. Dist. LEXIS 47388
  (N.D. Cal. Feb. 22, 2005) ....................................................14

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986).........................................................5

*Arco Indus. Corp. v. Chemcast,*
  633 F.2d 435 (6th Cir 1980)................................................6

*Atpac, Inc. v. Aptitude Solution, Inc.,*
  730 F. Supp. 2d 1174 (E.D. Cal. 2010) ....................................19

*Bayline Partners L.P. v. Weyerhaeuser Co.,*
  31 U.S.P.Q. 2d 1051 (N.D. Cal. 1994)....................................6, 7

*Cal-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.,*
  20 Cal. 4th 163 (1999)....................................................23

*Capsonic Group, Inc. v. PLas-met Corp.,*
  361 N.E. 2d 41 (Ill. App. Ct. 1977)........................................6

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986).....................................................4, 5

*Cort v. St. Paul Fire & Marine Ins. Cos.,*
  311 F.3d 979 (9th Cir. 2002) ..............................................23

*Delta Filter Corp. v. Morin,*
  108 A.D. 2d 991 (N.Y App. Div. 1985) .....................................6

*DVD Copy Control Assoc., Inc. v. Bunner,*
  116 Cal. App. 4th 241 (Ct. App. 2004).....................................8

*Facebook, Inc. v. Power Ventures, Inc.,*
  Case No. -08-05780 JW, 2010 U.S. Dist. LEXIS 93517
  (N.D. Cal. July 20, 2010)...............................................20, 21

*Fowler v Varian Assocs., Inc.*,
196 Cal. App. 3d 34 (Ct. App. 1987)...................................................................22

*In re Facebook Privacy Litig.*,
791 F. Supp. 2d 705 (N.D. Cal. 2011)...........................................................21, 22

*In re iPhone Application Litig.*,
Case No. 11-MD-02250-LHK 2011 U.S. Dist. LEXIS 106865
(N.D. Cal. Sept. 20, 2011)..................................................................................20

*In re Providian Credit Card Cases*,
96 Cal. App. 4th 292 (Ct. App. 2002) ..............................................................6, 7

*Kodadek v. MTV Networks, Inc.*,
152 F.3d 1209 (9th Cir. 1998)...........................................................................24

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir. 2009).......................................................14, 15, 16, 17

*Mattel, Inc. v. MGA Entertainment, Inc.*,
782 F. Supp. 2d 911 (C.D. Cal. 2011)................................................................23

*Mattel, Inc. v. MGA Entm't, Inc.*,
Case No. CV 04-9049 DOC, 2011 U.S. Dist. Lexis 85928
(C.D. Cal. Aug. 4, 2011)........................................................................................6

*MBL Corp. v. Diekman*,
445 N.E. 2d 418 (Ill. App. Ct. 1983) ...............................................................6, 7

*Morton v. Rank Am., Inc.*,
812 F. Supp. 1062 (C.D. Cal. 1993) (abrogated on other grounds by
*TMX Funding, Inc. v. Impero Techs. Inc.*, Case No. C 10-00202 JF
(PVT), 2010 U.S. Dist. Lexis 60260, *4 (N.D. Cal. June 8, 2010))........................5

*Motorola, Inc. v. Fairchild Camera & Instrument Corp.*,
366 F. Supp. 1173 (D. AZ 1973)..........................................................................7

*Pacific Express, Inc. v. United Airlines, Inc.*,
959 F.2d 814 (9th Cir. 1992) ........................................................................23, 24

*Pressure Science, Inc. v. Kramer*,
413 F. Supp. 618 (D. Conn. 1976) ........................................................................7

CHRISTIE, PARKER & HALE, LLP

-iii-

*Shamrock Foods v. Gast,*
  535 F. Supp. 2d 962 (D. Ariz. 2008) ............................................................ 19

*Silicone Image, Inc. v. Analogix Semiconductor, Inc.,*
  Case No. C-07-00635 JCS, 2007 U.S. Dist. Lexis 96073
  (N.D. Cal. Dec. 20, 2007) ............................................................................... 6

*SKF USA, Inc. v. Bjerkness,*
  636 F. Supp. 2d 696 (N. D. Ill. 2009) .......................................................... 19

*Smith & Hawken, Ltd. v. Gardendance, Inc.,*
  2004 U.S. Dist. LEXIS 22934 (N.D. Cal. Nov. 5, 2004) .......................... 23

*VFD Consulting, Inc. v. 21st Servs.,*
  425 F. Supp. 2d 1037 (N.D. Cal. 2006) ........................................................ 7

*Weiss v. Chrysler Motors Corp.,*
  515 F.2d 449 (2d Cir. 1975) ........................................................................... 13

*Weststeyn Dairy 2 v. Eades Commodities Co.,*
  280 F. Supp. 2d 1044 (E.D. Cal. 2003) ...................................................... 25

**RULES**

Fed. R. Civ. P. 26(a) ................................................................................................ 13

Fed. R. Civ. P. 37(c)(1) .......................................................................................... 13

Fed. R. Civ. P. 56(a) ................................................................................................ 4

Fed. R. Civ. P. 56(e) ................................................................................................ 5

**STATUTES**

18 U.S.C. § 1030 ..................................................................................................... 14

18 U.S.C. § 1030(a)(1)-(7) .............................................................................. 14, 16

18 U.S.C. § 1030(a)(2) ......................................................................................... 15

18 U.S.C. § 1030(e)(8) .......................................................................................... 15

18 U.S.C. § 1030(g) ........................................................................................ 14, 18

-iv-

CHRISTIE, PARKER & HALE, LLP

Cal. Civ. Code § 3426.1(d)(1)-(2) ..................................................................... 5

Cal. Penal Code §502(a) ............................................................................... 20

California Business and Professions Code § 17200 ......................................... 23

California Labor Code Section 2863 ............................................................... 22

California Penal Code § 502 ..................................................................... 20, 21

Uniform Trade Secrets Act ............................................................................ 22


**OTHER AUTHORITIES**

1 COULTER BOESCHEN ET AL., BUSINESS TORTS: UNFAIR TRADE §17.11
    (2011)......................................................................................................... 11

BUSINESS TORTS: UNFAIR TRADE §17.04................................................... 12

TRADE SECRETS PRACTICE IN CAL. § 4.2 (Continuing Education of the Bar,
    Cal. 2012) ................................................................................................... 11

CHRISTIE, PARKER & HALE, LLP

## I.   **INTRODUCTION**

Jane Chen a/k/a Chen Chen ("Chen") and Aprille Vergara ("Vergara"), two former employees of Plaintiff Lukasian House, LLC, ("LH") an importer and distributor of baskets and hampers, recently joined Ample International, Inc., ("Ample") a company founded and run by Chen's husband, Bruce Jin.   Until Chen and Vergara joined Ample, its primary focus was real estate.   Although Chen and Vergara assisted in some aspects of the real estate business when they began working for Ample, their primary focus was starting an importation and distribution business.   However, after trying to import several different commodities, they had little success.   Eventually, they focused on importing baskets and hampers, a business that Vergara knew from working with LH.

When LH discovered that its former employees were now its competition, LH's response was to bring this action to put the fledgling company out of business.   Plaintiff's claims are, for the large part, without merit.   For instance, LH alleges misappropriation of trade secrets.   However, LH has taken insufficient steps to ensure the secrecy of this information and some of the alleged trade secrets are publicly available – facts that are fatal to this claim.   Similarly, LH cannot succeed on its computer fraud claims because Chen and Vergara were authorized during their employment to access the electronic data at issue, did not damage LH's computers, and did not overcome technical barriers to access the data.   Plaintiff's intentional interference and unfair competition claims rise and fall with the trade secret and computer fraud claims.

Lastly, Chen and Vergara's purported breaches of their duties of loyalty during their employment with LH are for the large part subsumed or preempted by LH's other claims, and LH has failed to show that the only potentially actionable conduct has proximately caused any damages.   As a result, summary judgment is appropriate on this claim as well.

CHRISTIE, PARKER & HALE, LLP

## II.   **STATEMENT OF FACTS**

LH is an importer and distributor of baskets and hampers which are sourced from China.  [Uncontroverted Fact ("UF") 1.]  LH's business model is as follows: Factories in China contract with local villagers to produce basket and hamper products.  The factories are represented by vendors having direct contact with distributors such as LH in the United States.  The distributors promote their basket and hamper products to large retail chains, usually by providing them samples of the product.  When the retailer purchases products, it does so through the distributor; however, the products are often shipped directly from the supplier to the retailer.  [UF 2.]

Vergara and Chen began working at LH in May 2006 and November 2008, respectively.  [UF 4-5.]  During this time, they built LH's business "from the ground up," handling all of the day-to-day operations, selecting suppliers and working with them to resolve problems, soliciting customers, and developing new products.  [UF 6.]  Luke Wang ("Wang"), LH's owner, spent much of his time working on other ventures and left most business operations to Chen and Vergara. [UF 7-8.]

All of the files needed to run LH's business were stored on Vergara's desktop computer, to which all of LH's employees had ready access.  [UF 9-10.] These files included information concerning LH's customers, current and prospective products, sales information, margins, and supplier information, among other things.  [UF 9.]  Because their job duties usually required direct contact with China, Chen and Vergara frequently worked late hours, often from home.  [UF 12.]  In October 2009, Vergara purchased a personal laptop onto which she downloaded various work-related files to better allow her to work from home. [UF 13-15.]  Vergara also downloaded onto a portable hard disk numerous work-related files to facilitate performing her job duties from home.  [UF 16.] Wang was at all times fully aware that Vergara, as well as other employees, were

-2-

taking these files home.  [UF 17-18.]  Wang also had Vergara download a complete copy of all of LH's files to a portable hard drive and bring it home with her as a secure backup.  [UF 19.]  Vergara was instructed to do this several times, including when Wang planned to be out of town.  [UF 20.]  When Vergara left LH's employ, LH did not ask Vergara to return the laptop, and because Vergara understood the laptop to be hers, she made no affirmative efforts to return it.  [UF 21.]

The working conditions at LH were difficult.  Vergara consequently left LH on June 11, 2010.  [UF 22.]  After Vergara left, Wang tried to convince her to return.  Wang even went so far as to send Vergara a note on January 4, 2011[1] where he bragged about new customers LH had acquired since Vergara left the company and about the financial success of the company.  Wang included numerous financial figures as well as the identities of new and pre-existing customers on the note — information that LH now claims constitutes trade secrets.  [UF 24-26.]

Before joining LH, Chen had run her own successful import and distribution business for toys and seasonal items.  [UF 27.]  Chen ceased operation of that business around 2006 due to health reasons.  [UF 28.]  While working for LH, Chen referred LH to many vendors from her prior business, including her ocean forwarder, customs broker, insurance company, and courier company.  [UF 29-30.]  In May 2010, Chen considered returning to her prior business due in large part to the poor working conditions at LH's business.  [UF 31.]  Chen began making preparations to leave LH and join her husband at Ample where she would start and run an import and distribution division.

Chen and Vergara began working together at Ample.  [UF 32.]  They tried to import various commodities in an effort to get the import and distribution

---

[1]  During his deposition, Wang confirmed that the note is incorrectly dated January 4, 2010 when it should have been dated January 4, 2011.  [UF 24.]

CHRISTIE, PARKER & HALE, LLP

business up and running, and they also assisted with some real estate dealings on behalf of Ample. [UF 33.] The only success Chen and Vergara experienced was in their efforts to import the products with which they were already familiar: baskets and hampers. [UF 34.] Vergara continued to use the personal laptop she had obtained during her employment with LH to operate this business. [UF 35.]

LH sources its products from about fifty suppliers, with twelve of these being its "core" suppliers. [UF 36.] Defendants source their products from six suppliers, two of which are not used by LH, three of which LH has occasionally used in the past, and only one of which is one of its "core" suppliers. [UF 37.] Defendants use this supplier because it consistently provides the best quote for paper rope products, though they always seek bids from multiple suppliers. [UF 38.] Both LH and Defendants sell to large retail chain stores. [UF 39.]

When Wang discovered that his former employees had opened a competing business, he began a campaign to destroy their business. LH has done everything it can to undercut Defendants' business including refusing to pay money it owes its suppliers if they do not agree to cease doing business with Defendants; buying Defendants' products out from under them; and telling Defendants' suppliers and customers that Defendants will not be able to stay in business, causing the suppliers charging Defendants extremely high deposits on their orders. [UF 40]

## III.   <u>LEGAL STANDARDS</u>

Summary judgment is proper where the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the moving parties, Defendants bear the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The burden then shifts to LH to set out specific facts showing that there is a genuine issue for

CHRISTIE, PARKER & HALE, LLP

1    trial.  Fed. R. Civ. P. 56(e).  It is not enough for the party opposing a properly

2    supported motion for summary judgment to rest upon the mere allegations or

3    denials of the adverse party's pleadings.  *Id.*; *see also Anderson v. Liberty Lobby,*

4    *Inc.*, 477 U.S. 242, 256 (1986).

5        Because LH affirmatively bears the burden on each of the issues presented

6    in Defendants' motion, Defendants can show that they are entitled to summary

7    judgment by simply demonstrating that LH has not put forth sufficient evidence

8    to support its claims.  *Celotex*, 477 U.S. at 322, 325.

9    **IV.    LH DOES NOT POSSESS VALID TRADE SECRETS**

10       LH has asserted that Defendants misappropriated trade secrets related to (a)

11   the types of products each of its suppliers can produce; (b) the identities of LH's

12   customers; (c) the identities of the buyers at each of LH's customers; (d) the

13   buying cycles of each of LH's customers; (e) the identities of prospective

14   customers; (f) LH's costs; and (g) LH's margins.  [UF 41.]  However, under

15   California law, a trade secret must (1) "derive[] independent economic value,

16   actual or potential, from not being generally known to the public or to other

17   persons who can obtain economic value from its disclosure or use; and (2) [be]

18   the subject of efforts that are reasonable under the circumstances to maintain its

19   secrecy."  Cal. Civ. Code § 3426.1(d)(1)-(2).  LH cannot meet this standard.

20       **A.    LH Did Not Take Sufficient Steps To Protect Its Alleged Secrets**

21       LH cannot carry its burden to show that it took reasonable efforts to

22   maintain the secrecy of its purported trade secrets.  While heroic efforts or

23   expensive procedures are not required to protect a trade secret, a plaintiff

24   asserting that it possesses a valid trade secret must be able to point to specific

25   actions taken to maintain its secrecy.  *See Morton v. Rank Am., Inc.*, 812 F. Supp.

26   1062, 1075 (C.D. Cal. 1993) (stating that plaintiff must allege facts showing it

27   took reasonable efforts) (abrogated on other grounds by *TMX Funding, Inc. v.*

28   *Impero Techs. Inc.*, Case No. C 10-00202 JF (PVT), 2010 U.S. Dist. Lexis 60260,

-5-

*4 (N.D. Cal. June 8, 2010)).  What is reasonable generally varies with the value of and the risk to the information.  *See, Mattel, Inc. v. MGA Entm't, Inc.*, Case No. CV 04-9049 DOC (RNBx), 2011 U.S. Dist. Lexis 85928, at *21 (C.D. Cal. Aug. 4, 2011).  Therefore, the question of what is reasonable is largely fact specific and will vary from case-to-case.  *In re Providian Credit Card* Cases, 96 Cal. App. 4th 292, 306 (Ct. App. 2002); *Mattel*, 2011 U.S. Dist. Lexis 85928 at *21.

The following circumstances have been found to weigh in favor of finding *inadequate* measures to protect trade secrets:

**Access**

- Disclosure of information to visitors, suppliers, and customers without restriction or notices of confidentiality.  *Silicone Image, Inc. v. Analogix Semiconductor, Inc.*, Case No. C-07-00635 JCS, 2007 U.S. Dist. Lexis 96073, at *48 (N.D. Cal. Dec. 20, 2007).

- Disclosure of information to those without a "need to know."  *Bayline Partners L.P. v. Weyerhaeuser Co.*, 31 U.S.P.Q. 2d 1051, 1055 (N.D. Cal. 1994).

- Information readily accessible to all employees with no restricted access to or physical segregation of information.  *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 304 (Ct. App. 2002); *Delta Filter Corp. v. Morin*, 108 A.D. 2d 991, 993 (N.Y App. Div. 1985).

- No building security.  *Capsonic Group, Inc. v. PLas-met Corp.*, 361 N.E. 2d 41, 44 (Ill. App. Ct. 1977).

- No internal controls on document distribution, access, security, or destruction.  *Arco Indus. Corp. v. Chemcast*, 633 F.2d 435, 443 (6th Cir 1980); *MBL Corp. v. Diekman*, 445 N.E. 2d 418, 425 (Ill. App. Ct. 1983).

**Notification**

- Not requiring employees, vendors, suppliers or contractors to sign nondisclosure agreements.  *Providian*, 96 Cal. App. at 304; *Bayline*

-6-

*Partners L.P. v. Weyerhaeuser Co.*, 31 U.S.P.Q. 2d 1051, 1055 (N.D. Cal. 1994).

- No notice of confidentiality given to employees, visitors, suppliers, or vendors. *Providian*, 96 Cal. App. 4th at 304; *VFD Consulting, Inc. v. 21st Servs.*, 425 F. Supp. 2d 1037, 1050-51 (N.D. Cal. 2006).

- Not identifying what information or types of information are considered confidential and not marking, or otherwise indicating, information as confidential. *Providian*, 96 Cal. App. 4th at 304; *MBL*, 445 N.E. 2d at 425.

- Not identifying trade secrets either when a nondisclosure agreement is signed or during an exit interview. *Motorola, Inc. v. Fairchild Camera & Instrument Corp.*, 366 F. Supp. 1173, 1185 (D. AZ 1973).

- Employees being unaware of obligations regarding the confidentiality restrictions, in particular to there being no written policy. *Pressure Science, Inc. v. Kramer*, 413 F. Supp. 618, 627 (D. Conn. 1976).

As demonstrated below, LH took almost no efforts during Vergara's and Chen's employment to maintain the confidentiality of the information it now claims are trade secrets and much of that information is publicly available.

### 1.   LH's Supplier and Customer Information Is Publicly Available On The Internet

Although LH asserts that its supplier and customer information are trade secrets, this information is publicly accessible on a website operated by Trade Data Services, Inc. ("TDS") at www.importgenuis.com.   [UF 42, 46.]   TDS promises its customers that it can provide information as to where their competitors source their products and promises that its "data reveals suppliers, product volumes, and industry trends for U.S. importers and distribution companies."[2]   [UF 43.]   Chen was aware of this on similar websites while

---

[2] This information is actually collected by U.S. Customs and is publicly available. Services like TDS provide an easy way to access this information. [UF 44.]

CHRISTIE, PARKER & HALE, LLP

employed at LH.  [UF 45.]

A simple search for "Lukasian House" on TDS' website resulted in a report showing LH's suppliers in China, their addresses, the dates goods purchased from this supplier arrived in the United States, the quantity of goods shipped, the weight and physical dimensions of the goods, a description of the goods (e.g., banana leaf baskets), and, in certain cases, the ultimate customer for whom the goods were destined.  [UF 46.]  Wang confirmed during his deposition that the report accurately identified his suppliers but maintained that information could still be a trade secret even if it is publicly accessible on the internet.  [UF 46.] However, information publicly accessible to a competitor may lose its trade secret protection.  *See DVD Copy Control Assoc., Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (Ct. App. 2004) ("Publication on the Internet does not necessarily destroy the secret *if* . . . it does not become generally known to the relevant people, i.e., potential competitors . . .") (emphasis added).

## 2. LH Provided Financial And Customer Information To Vergara After She Was No Longer Employed By LH

On January 4, 2011, Wang sent Vergara a letter asking her to come back to work for LH.  [UF 24.]  In an effort to entice Vergara to return, Wang bragged about new customers LH had acquired and about the success of the company. Wang disclosed detailed financial information in the letter including customer information LH now claims is confidential.  [UF 25-26.]  Plainly, LH did not protect its "confidential" information and did not treat the information as being confidential.  Apparently, LH decided that this information was confidential only after it discovered that Vergara and Chen were running a competing business. LH's change of heart does not transform the information into trade secrets.

## 3. LH's "Trade Secrets" Were Not Subject To Any Of The Typical Controls Used To Protect Valid Trade Secrets

In addition to the fact that much of LH's purported trade secrets are

-8-

CHRISTIE, PARKER & HALE, LLP

publicly available, LH did not take sufficient steps to keep this information confidential. Indeed, Olga Batygin ("Batygin"), an independent contractor, stated that during her employment no measures were taken to protect the secrecy of any of LH's information from her. [*See generally* UF 48-76.] At his deposition, Wang, LH's owner, did not contradict Batygin's testimony.

It is undisputed that all of LH's supposed "trade secrets" were stored on Vergara's desktop computer during her employment.[3] [UF 9.] This computer was not password protected, and every employee had access to it. [UF 10.] No firewall was installed to protect the computer from unauthorized remote access. [UF 50.] To the contrary, Batygin testified that, based on her experience at Caltech, the computer system was readily accessible by anyone from the outside, so much so that even her brother has the necessary skills to access and download the files. [UF 51.] As a result, access of various types routinely occurred: Employees would frequently email files to their personal email accounts and download them to their personal computers at home. [UF 52.] No steps were taken to ensure that the information being transmitted was encrypted or password protected, and none of these files were ever marked as confidential.[4] [UF 11, 53.] Wang was fully aware that this was happening. [UF 54.]

None of LH's employees were ever cautioned to be careful about taking sensitive information home, nor were they ever instructed to delete files from their personal computers after using them. In fact, there was no document retention or destruction policy of any kind in place. [UF 50-56, 59.] As a result,

---

[3] Although Vergara's computer appears to have been used as a central repository, Wang admitted at deposition that he is unsure exactly which employees, past or present, have trade secret information on their laptops. [UF 47.]

[4] Batygin had at one time strongly urged LH to at least purchase relatively inexpensive software that would allow LH to have encrypted communications with suppliers in China. LH declined to make this minimal investment. [UF 58.]

these files were accessible to LH's many[5] past employees' families, friends, and anyone else with access to their personal computers, including, potentially, any third parties who later purchased or were gifted any of these computers. Further, while LH claims it asked Vergara to return her laptop, it admits dropping the issue for over a year when Vergara requested that LH stop communicating with her. [UF 60-61.] As such, LH did nothing about the fact that a former employee was in possession of its purported trade secrets even though it was no longer on amicable terms with that former employee.

Like its electronic files, LH's physical files were also freely accessible. None of the files or documents bore any sort of confidentiality designation, and they were all stored in a series of unlocked filing cabinets to which all employees had ready access. None of the files containing "trade secrets" were segregated from the non-confidential files, nor were they treated differently. [UF 56, 62-63.]

Neither the electronic or physical files were located in a secure building. Although the exterior to the building was locked, all employees had keys. There was no alarm system and thus, anyone who had access to an employee's key could have entered the building at any time, undetected, and removed the "trade secret" information. [UF 64.]

Finally, LH had no written or oral policy regarding the protection of confidential information, never designated any information as trade secrets, and never directly instructed any of its employees to maintain the confidentiality of any purported secrets. [UF 65, 67.] Rather, Wang frequently claimed that LH had nothing to hide and had no secrets. [UF 66.] As such, when employees left, LH did not conduct an exit interview to instruct the former employee of his or her duty to keep certain information confidential or inquired as to whether the former employee had returned or destroyed any physical or electronic files. [UF 68.]

---

[5] Defendants are aware of at least 11 past employees of LH. [UF 57.]

CHRISTIE, PARKER & HALE, LLP

### 4.     The "Trade Secrets" Were Publicly Disseminated

Not only did LH take insufficient steps to safeguard this supposedly confidential information, it actually publicly disseminated much of the information at issue.  For instance, Batygin originally found her position at LH through a temporary staffing agency.  The staffing agency prepared Batygin for her interview by providing "insider tips" consisting of a list of LH's customers that she should research.  The identity of these customers – which LH now claims are secret – were provided to the staffing agency by one of LH's employees.  At no point was this customer list described as secret or confidential, and LH never entered into any nondisclosure agreement with the staffing agency. [UF 70-73.]

LH also provided its suppliers with its purportedly confidential customer and product information, and those suppliers in turn publicly disseminated LH's information.  For example, if one of LH's items sold well, the supplier would email its other distributors to let them know it could make this same product for them and that the item was selling particularly well at the particular customer.  This was true even if the item had been custom ordered by LH or another company. [UF 74-75.]

Because the identify of LH's customers and products, including prospective products, were being disseminated to the public, this information does not constitute a trade secret.

### 5.     The "Trade Secrets" Were Not Protected By Any Nondisclosure Agreements

A nondisclosure agreement is perhaps the most common trade secret protection step and generally the least expensive to execute.  1 COULTER BOESCHEN ET AL., BUSINESS TORTS: UNFAIR TRADE §17.11 (2011).  In the area of disclosure to external parties, *e.g.,* independent contractors, the courts require greater efforts to maintain secrecy. TRADE SECRETS PRACTICE IN CAL. § 4.2 (Continuing Education of the Bar, Cal. 2012); BUSINESS TORTS: UNFAIR TRADE

CHRISTIE, PARKER & HALE, LLP

§17.04.  However, LH did not enter into a nondisclosure agreement with any of its employees, vendors, contractors, buyers, customers, or suppliers. [UF 76.]

Further, LH made no effort to maintain confidentiality of LH's "trade secrets" as to Batygin, an independent contractor, even though LH was required to take even greater efforts than normal to protect its "trade secrets."[6]  [UF 49.]

### B.   The Information Does Not Have Independent Economic Value

Plaintiff cannot meet its burden to show that its purported "trade secrets" derive independent economic value from being kept secret.

On February 3, 2012, Ample propounded Interrogatory No. 5, which asked LH to identify with specificity any purported economic value of its trade secrets. [UF 78.]  LH's tautological response simply echoed the definition of a trade secret and provided an unsupported dollar value:

> Notwithstanding this objection and, subject to it, LH responds that the economic value of its trade secrets lies in the fact that it comprises a compilation of information that derives independent economic value in that it is not generally known to the public and that are [*sic*] the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  [¶]  LH further responds that it has invested over $3 million in its 10 year [*sic*] of business to develop trade secrets. The investment includes approximately $1.5 million in compensation for Luke Wang, $0.5 million in employee salaries, and over $1 million in business expenses.  The economic value of LH's trade secrets is at

---

[6] LH continues to take not steps to protect its trade secrets. On March 13, 2012, LH publicly filed with this Court with its reply in support of its motion to amend the scheduling order an Excel Spreadsheet containing file listings from two of Defendants' hard drives that were imaged during discovery. These file listings identify by name LH's suppliers, buyers, and customers. In addition to containing supplier, buyer, and customer information, this document also contains information as to what kind of products each supplier can produce. The spreadsheet also shows which suppliers provide goods to each customer. [UF 77]

CHRISTIE, PARKER & HALE, LLP

least twice this investment, which is $6 million.

[UF 79 (objection omitted).]

LH has the duty to respond to interrogatories truthfully and completely, in a clear and precise manner. *Weiss v. Chrysler Motors Corp.*, 515 F.2d 449, 456 (2d Cir. 1975). Because LH has not provided in response to Defendants' interrogatory any facts supporting its contention that its purported trade secrets derive any independent economic value, LH is barred from presenting any new facts supporting its claim in connection with this summary judgment motion. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless").

Moreover, there are not many factories in China that both make baskets and are large enough to produce the quantity needed by LH or Defendants. All of these factories attend the widely known Canton Fair, and they all constantly vie for distributor's business, and in doing so, give rival distributor's information about competitors and profitable items for profitable customers. [UF 80.] Moreover, some products can only be cost-effectively produced by one or two factories due to the limited availability of the source material. [UF 81.] As a result, while it may take some time to narrow down the small range of available suppliers to an acceptable "chosen few," it can be readily done with limited trial and error.

The limited number of available suppliers combined with those suppliers being highly publicized undermines LH's claims of both secrecy and independent economic value. Because LH cannot carry its burden of proof to meet either requirement for having valid trade secrets, summary judgment dismissing LH's claim of misappropriation of trade secrets is in order.

CHRISTIE, PARKER & HALE, LLP

## V.   LH DOES NOT POSSESS A VIABLE CLAIM UNDER THE COMPUTER FRAUD AND ABUSE ACT – 18 U.S.C. § 1030(G)

The Computer Fraud and Abuse Act ("CFAA"), codified at 18 U.S.C. § 1030, creates a right of action for private persons injured by various computer crimes.  *See* 18 U.S.C. §1030(g); *see also LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130-31 (9th Cir. 2009).  Section 1030(g) of the CFAA provides that a "civil action for a violation of this section may be brought only if the conduct involves one of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)."  Thus, in order to bring an action under the CFAA, "a private LH must prove that the defendant violated one of the provisions of [18 U.S.C.] § 1030(a)(1)-(7), and that the violation involved one of the factors listed in [18 U.S.C.] § 1030(a)(5)(B)(i)."  *LVRC Holdings*, 581 F.3d at 1131-32.  In evaluating such a claim, "the Court must look for unauthorized access to a protected **computer**, not to the unauthorized access or use of electronic data."  *Allied N. Am. Ins. Broker. Corp. v. Woodruff-Sawyer*, No. C 04-2527 MJJ, 2005 U.S. Dist. LEXIS 47388, at *14 (N.D. Cal. Feb. 22, 2005) (emphasis added).

LH cannot succeed on this claim for two reasons.  First, Defendants' actions do not create liability under the CFAA as a matter of law.  Second, the damages it seeks to recover are not recoverable under the CFAA.

### A.   Defendants' Purported Unauthorized Access Does Not Create Liability As A Matter Of Law

The only potentially applicable conduct described in 18 U.S.C. § 1030(a)(1)-(7) involves "accessing computers ***without authorization or in excess of authorization***, and then taking specified forbidden actions, ranging from obtaining information to damaging a computer or computer data."  *LVRC Holdings*, 581 F.3d at 1131 (emphasis added). [7]  In order to successfully bring an

---

[7] The remaining subsections deal with the United States government, trafficking, or extortion. LH has not alleged such actions. The only remaining subsections

CHRISTIE, PARKER & HALE, LLP

1   action under this section, a plaintiff must show that the defendant "(1)

2   intentionally accessed a computer, (2) without authorization or exceeding

3   authorized access, and that he (3) thereby obtained information (4) from any

4   protected computer . . . and that (5) there was loss to one or more persons during

5   any one-year period aggregating at least $5,000 in value." *Id.* at 1132; *see also*

6   18 U.S.C. § 1030(a)(2).

7           Although the CFAA does not define the term "authorization," the Ninth

8   Circuit has held that "an employer gives an employee 'authorization' to access a

9   company computer when the employer gives the employee permission to use it."

10   *LVRC Holdings*, 581 F.3d at 1133. In so holding, the court in *LVRC* rejected the

11   argument that "authorization to use a computer ceases when an employee resolves

12   to use the computer contrary to the employer's interest." *Id.* at 1133. As the

13   court explained, "for purposes of the CFAA, when an employer authorizes an

14   employee to use a company computer subject to certain limitations, the employee

15   remains authorized to use the computer even if the employee violates those

16   limitations." *Id.* Accordingly, "a person who 'intentionally accesses a computer

17   without authorization'...accesses a computer *without any permission at all*, while

18   a person who 'exceeds authorized access'....has permission to access the

19   computer, but accesses information on the computer that the person is not entitled

20   to access." *Id.* (emphasis added).

21           ***As such, the Ninth Circuit rejected the notion that an employee acts***

22   ***"without authorization" once his mental state has changed "from loyal***

23   ***employee to disloyal competitor."*** *Id.* at 1134 (emphasis added). In *LVRC*, the

24   defendant employee transferred the employer's key documents and information to

25   ─────────────────────────────────────────────────────

26   deal with "damage." LH cannot assert it has suffered "damage" under the statute.
    The statute expressly defines "damage" to mean "impairment to the integrity or
27   availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).
    It is undisputed that there was no impairment to the integrity of any of LH's data,
28   programs, systems, or information within the definition of the statute. [UF 88.]

1   himself by emailing the documents from his work computer to his personal email
2   account. *Id*. at 1129-30. The court reasoned that because the defendant had
3   permission to access the computer by virtue of his employment with the plaintiff,
4   and because he was still employed with the plaintiff when he emailed the
5   documents to himself, he had authorization to use the computer within the
6   meaning of §§ 1030(a)(2) and (4). *Id*. at 1133.

7        Further, the Ninth Circuit rejected the argument that the defendant's
8   conduct "exceeded [the defendant's] authorized access," because it was
9   "undisputed that [the defendant] was entitled to obtain the documents at issue."
10  *Id*. at 1135 n.7. Moreover, "nothing in the CFAA suggests that a defendant's
11  authorization to obtain information stored in a company computer is 'exceeded' if
12  the defendant breaches a state law duty of loyalty to an employer." *Id*.
13  Therefore, the defendant's conduct in transferring the documents did not
14  "exceed[] authorized access" for purposes of §§ 1030(a)(2) and (4). *Id*.

15       In this case, LH alleges that Vergara and Chen "accessed [LH]'s computer
16  system for the purpose of downloading information" and that "[s]uch access was
17  without authorization and/or it exceeded Vergara and Chen's authorized access."
18  [UF 86.] LH does not indicate which provision(s) of 18 U.S.C. § 1030(a)(1)-(7)
19  Vergara and Chen allegedly violated. Nevertheless, Vergara and Chen's conduct
20  here is similar to the conduct in *LVRC* that was found to be authorized where the
21  defendant employee used his work computer to transfer documents containing the
22  plaintiff's information to himself while he was still employed with the plaintiff.
23  *Id*. at 1129. Because he was authorized by the plaintiff to use the computer, was
24  still employed by the plaintiff, and was entitled to obtain the documents at issue,
25  he was found to have authorization to use the computer, and his conduct was
26  found not to have exceeded the authorized access. *Id*.

27       Similarly, LH alleges that Vergara and Chen accessed its computer system
28  and also used a company-owned laptop computer to copy data and files from that

-16-

system.  [UF 86-87.]  LH alleges that it provided the laptop computer containing its trade secrets to Vergara in 2009 for her use in connection with her duties as its employee.   [UF 88.]   LH further admits that it disclosed its trade secrets to Vergara and Chen [UF 89] and continued to permit Vergara and Chen to have access to its trade secrets until Vergara and Chen's employment with LH terminated.  [UF 87.]  It is further undisputed that Vergara frequently took a hard drive home containing all of LH's files so that she could perform her job duties from home, and LH was aware of and authorized this activity.  [UF 15-20, 52, 54, 87.]  Vergara's employment with LH terminated on June 11, 2010 and Chen's employment with LH terminated on July 9, 2010 [UF 22-23]; LH alleges that the "unauthorized access" occurred in May 2010 [UF 87], which is during the period of Vergara's and Chen's employment with LH.

Therefore, like the defendant in *LVRC*, Vergara and Chen had permission to access the computer by virtue of their employment with LH, and both Vergara and Chen were still employed with LH at the time the "unauthorized access" was alleged to have occurred.  Further, Vergara and Chen were entitled to obtain the information that they allegedly transferred from LH's system because LH was aware that Vergara possessed the laptop computer containing that information and was aware of the external hard drive Vergara possessed.   Accordingly, Vergara and Chen had authorization to use the computer within the meaning of §§ 1030(a)(2) and (4), and their conduct in accessing and downloading the information on the computer did not "exceed[] authorized access" for purposes of §§ 1030(a)(2) and (4).  *LVRC Holdings*, 581 F.3d at 1135, n.7.

**B.**     **The Computer Fraud And Abuse Act Does Not Allow For The Type Of Recovery LH Seeks**

Under *subsection (g)* of the CFAA, only persons harmed in certain ways by violations of the CFAA can bring a civil action.  The CFAA provides that:

Any person who suffers ***damage or loss*** by reason of a violation of

-17-

this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. . . .

18 U.S.C. § 1030(g) (emphasis added). The only factor listed in subsection (c)(4)(A)(i) which is relevant in this action is[8]:

(I) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value.

*Id.* at § 1030(c)(4)(A)(i). [UF 82.]

The statute defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id* at § 1030(e)(11).

Courts have held that "loss" therefore means two things: (1) "'any reasonable costs to the victim' and (2) lost revenue or other damages incurred as a result of an interruption of service." *See, e.g., Atpac, Inc. v. Aptitude Solution,*

---

[8]   The other factors are: (II) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals; (III) physical injury to any person; (IV) a threat to public health or safety; (V) damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; or (VI) damage affecting 10 or more protected computers during any 1-year period; . . . *Id.*

-18-

*Inc.*, 730 F. Supp. 2d 1174, 1184 (E.D. Cal. 2010). "To allege loss under the CFAA, '[LH] must identify impairment of or damage to the computer system that was accessed without authorization.'" *Id.* (citation omitted). "Cognizable costs also include 'the costs associated with assessing a hacked system for damage[ and] upgrading a system's defenses to prevent future unauthorized access." *Id.* (citation omitted, alteration in original). LH has not alleged or produced evidence of any costs associated with Defendants' purported unauthorized access to its computer systems. [UF 83.] LH's recovery is therefore limited to "lost revenue or other damages."

A loss of revenue, however, must result from the unauthorized server breach itself, and not from subsequent use of information obtained from the server. *See id.* at 1184-85 ("The definition of 'loss' itself makes clear Congress's intent to restrict civil actions under subsection (I) to the traditional computer 'hacker' scenario – where the hacker deletes information, infects computers, or crashes networks."). Thus, "*[p]urely economic harm unrelated to the computer systems is not covered by this definition.*" *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 721 (N. D. Ill. 2009) (emphasis added). In fact, the Court in *SKF USA* held that former employees' unauthorized transfer of confidential files and trade secrets to thumb drives which were brought to a new employer and eventually resulted in lost business to plaintiff did not constitute a "loss" under the CFAA sufficient to support a civil action. *Id.* at 721. This type of "loss" is exactly the kind of "loss" for which LH seeks to recover (UF 84), and LH's recovery is therefore barred as a matter of law. *See Shamrock Foods v. Gast*, 535 F. Supp. 2d 962, 966 (D. Ariz. 2008) ("Thus, the legislative history confirms that the CFAA was intended to prohibit electronic trespassing, not the subsequent use or misuse of information.").

-19-

## VI.   LH DOES NOT HAVE A VIABLE CLAIM FOR A VIOLATION OF THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT

The Comprehensive Computer Data Access and Fraud Act ("CDAFA"), codified at California Penal Code § 502, was enacted to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code §502(a).  LH alleges that Defendants have violated § 502(c) of the CDAFA, based on "Defendants' unauthorized access to [LH]'s computer system in May 2010, their use of the files and records copied from that system, their continued unauthorized access to the company-owned laptop and their use of the files and records, including [LH]'s Trade Secrets, on that laptop." [UF 86]

As it is undisputed that Defendants not have altered, deleted, damaged, or destroyed any of LH's data, computer, computer system, or computer network (UF 90), the subsections of § 502(c) requiring those types of actions do not apply here. *See, e.g., Facebook, Inc. v. Power Ventures, Inc.*, Case No. -08-05780 JW, 2010 U.S. Dist. LEXIS 93517, at *18-19 (N.D. Cal. July 20, 2010).   The remaining subsections of § 502(c) that may apply are §§ 502(c)(2), (3), and (7). *See id.* at *19.  All three of these subsections "require that Defendants' acts with respect to the computer or computer network be taken without permission." *Id.* at *20.

Although the CDAFA does not define the term "without permission," the Northern District of California has determined that "individuals may only be subjected to liability for acting 'without permission' under Section 502 if they 'access[] or us[e] a computer, computer network, or website in a manner that overcomes technical or code-based barriers.'" *In re iPhone Application Litig.*, Case No. 11-MD-02250-LHK 2011 U.S. Dist. LEXIS 106865, at *38 (N.D. Cal.

CHRISTIE, PARKER & HALE, LLP

1    Sept. 20, 2011).  For example, in *Power Ventures*, 2010 U.S. Dist. LEXIS 93517,

2    at \*34-36, the court concluded that a defendant could only be found liable under §

3    502 if the plaintiff could prove that that the defendant "circumvented...technical

4    barriers" intended to block defendant's access to the LH's computer or computer

5    system.  *See also In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 716 (N.D.

6    Cal. 2011).  The court further concluded that "using a computer network for the

7    purpose that it was designed to serve, even if in a manner that is otherwise

8    improper, is not the kind of behavior that the legislature sought to prohibit when it

9    enacted Section 502."  *Power Ventures*, 2010 U.S. Dist. LEXIS 93517, at \*24; *Id.*

10   at \*29 ("access to a computer may be 'authorized,' within the statutory meaning

11   of the term, even if that access violates an agreed upon term of using that

12   computer") (*citing LVRC*, 581 F.3d at 1130 (9th Cir. 2009)).

13           Thus, where there are no technical barriers in place blocking a defendant

14   from accessing the computer or computer network, and where the plaintiff does

15   not allege that the defendant circumvented technical barriers to gain access to the

16   computer or computer network, it is "impossible... for [a] [d]efendant to be liable

17   under the subsections of Section 502 which require a defendant to act 'without

18   permission.'"  *See In re Facebook Privacy Litig.*, 791 F. Supp. 2d at 716.

19           In this case, it is undisputed that there were no technical barriers in place

20   blocking Defendants' access to its computer systems that Defendants overcame.

21   [UF 91.] To the contrary, the testimony of LH's former employee Batygin clearly

22   states that there was no password protection or security for the files in question,

23   and LH admits that Chen and Vergara had ready access to these files.

24   Accordingly, Defendants are not liable under the subsections of § 502(c) which

25   require Defendants to have acted "without permission."

26           The only subsection of § 502(c) that does not explicitly require access

27   "without permission" for liability, § 502(c)(8), does not apply here, as LH has not

28   alleged any facts suggesting that Defendants introduced viruses, worms, or other

malware into any computer or computer system of LH that "usurp[ed] the normal operation" of that computer or computer system. *See, e.g., In re Facebook Privacy Litig.*, 791 F. Supp. 2d at 716. Therefore, because none of the subsections of § 502(c) are applicable, LH cannot succeed on this claim as a matter of law and summary judgment dismissing the claim is in order.

## VII.   **DUTY OF LOYALTY**

A duty of loyalty is imposed by California Labor Code Section 2863, which provides that any employee "who has any business to transact on his own account, similar to that entrusted to him . . . shall always give the preference to the business of the employer." Cal. Labor Code § 2863. However, "California law does permit an employee to seek other employment and even to make some 'preparations to compete' before resigning." *Fowler v Varian Assocs., Inc.*, 196 Cal. App. 3d 34, 41 (Ct. App. 1987). To succeed on its claim, LH must prove (1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damages proximately caused by that breach. *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410 (Ct. App. 2007). LH cannot succeed on this claim because the alleged wrongful acts of Defendants are either not actionable or because LH has provided no evidence that any potentially actionable conduct proximately caused damage to LH.

LH alleges that Chen and Vergara breached their duties of loyalty to LH by "secretly establishing a business with defendant Ample in direct competition with [LH] while they were still employed by [LH]; transferring their loyalty to Ample; . . . securing preferential rates from vendors based upon their status as [LH's] agents; copying at least 300,000 of [LH's computerized digital files, which included [LH] Trade Secrets, from [LH's] computer system for Ample while they were still employed by [LH]; and using [LH's] confidential information . . . for their own benefit and the benefit of Ample." [UF 92.]

The Uniform Trade Secrets Act "supersedes claims based on the

misappropriation of confidential information, whether or not that information meets the statutory definition of a trade secret." *Mattel, Inc. v. MGA Entertainment, Inc.*, 782 F. Supp. 2d 911, 987 (C.D. Cal. 2011). Thus, any alleged copying of electronic files or trade secrets does not give rise to a breach of loyalty claim. LH's only remaining basis for this claim is that Chen and Vergara secured preferential rates from vendors based upon their status as LH's agents. However, there is no evidence showing that LH was proximately damaged by Chen and Vergara entering into a contract with vendors on behalf of themselves or Ample while employed with LH as opposed to doing so after their employment ended. Because LH cannot show any damages that were proximately caused by the alleged breach, it cannot succeed on this claim as a matter of law.

## VIII. LH'S UNFAIR COMPETITION CLAIM FAILS BECAUSE ALL OF THE ALLEGED ACTIVITY IS LAWFUL

California Business and Professions Code § 17200 "provides a private cause of action for any 'unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising.'" *Cort v. St. Paul Fire & Marine Ins. Cos.*, 311 F.3d 979, 987 (9th Cir. 2002). According to the California Courts of Appeal, "an 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Smith & Hawken, Ltd. v. Gardendance, Inc.*, 2004 U.S. Dist. LEXIS 22934, at *17 (N.D. Cal. Nov. 5, 2004) (internal citations omitted). A defendant's full compliance with the underlying law acts as a complete defense to a Section 17200 claim alleging an unlawful act. *Cal-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 184 (1999). Moreover, the competitor privilege serves as a defense to conduct when a defendant's "purpose is *at least in part* to advance his interest in competing with the other." *Pacific Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 819-20 (9th Cir. 1992). The Ninth Circuit has cited with approval the

-23-

CHRISTIE, PARKER & HALE, LLP

California Court of Appeal's explanation of the law:

> The policy of the common law has always been in favor of free competition, which proverbially is the life of trade. So long as the LH's contractual relations are merely contemplated or potential, it is considered to be in the interest of the public that any competitor should be free to divert them to himself by all fair and reasonable means. . . . In short, it is no tort to beat a business rival to prospective customers. Thus, in the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiations behind the LH's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the LH, all without incurring liability.

*Id.* at 820.

As explained above, LH cannot succeed as a matter of law on its claims for misappropriation of trade secrets, computer fraud, and breach of loyalty. As a result, any alleged conversion of the laptop cannot be linked to Defendants' business practices because Defendants were already legally in possession of the files on the laptop and those files do not contain trade secrets. The only remaining claim, which is for copyright infringement, cannot serve as a basis for unfair competition as a matter of law. *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1213 (9th Cir. 1998) (LH's claim that defendant was guilty of California unfair competition because defendant improperly reproduced his cartoon characters is a disguised copyright claim that is preempted).

The only remaining conduct at issue is Defendants' use of the phrase "opportunity buy." However, it is undisputed that this is a common phrase frequently used by numerous third parties, including companies like Wal-Mart, to

CHRISTIE, PARKER & HALE, LLP

market their products and that LH does not possess proprietary or trademark rights in it. [UF 93.] LH therefore cannot succeed on its unfair competition claim as a matter of law.

## IX. THE PROSPECTIVE INTERFERENCE WITH ECONOMIC ADVANTAGE CLAIM FAILS BECAUSE ALL OF THE ALLEGED ACTIVITY IS LEGAL

The law respects the "right to conduct business in competition with that of another." *Aagard v. Palomar Builders, Inc.*, 344 F. Supp. 2d 1211, 1219 (E.D. Cal. 2004). To succeed on an intentional interference claim, a LH must demonstrate that "defendant's interference was wrongful by some measure beyond the fact of the interference itself." *Weststeyn Dairy 2 v. Eades Commodities Co.*, 280 F. Supp. 2d 1044, 1089-90 (E.D. Cal. 2003). As with the unfair competition claim, there is no predicate wrongful act to which LH can connect this claim. As a result, LH cannot succeed on this claim.

## X. CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment on LH's claim for trade secret misappropriation, federal and state computer fraud, breach of loyalty, unfair competition, and prospective interference claim.


DATED: March 26, 2012                  Respectfully submitted,

                                       CHRISTIE, PARKER & HALE, LLP


                                       By
                                          Edward R. Schwartz
                                          Steven E. Lauridsen

                                       Attorneys for Defendants,
                                       Ample International, Inc., Chen Chen a/k/a
                                       Jane Chen and Aprille Vergara

SES PAS1165573.5-*-03/26/12 3:37 PM

CHRISTIE, PARKER & HALE, LLP

-25-